PROVOSTY, J.
Plaintiff sues for separation from bed and board on the grounds of excesses and cruel treatment and defamation. The answer is an admission of the marriage, followed by a general denial.
The parties were married in January, 1889. There are two children of the marriage, both boys, one aged 13 and the other 6. The admission is made that “the parties to this litigation are persons of good station, of the highest standing, culture, refinement.”
Six or seven years before the institution of this suit an old colored woman came to the house of one of the witnesses in the night with a message from plaintiff to come over at once to help her; that Mr. Harrison was drunk. Says the witness;
“When I reached the yard Mrs. Harrison was out in the yard with the door closed, and she told me that Mr. Harrison had put her out, and she wanted me to go into the house and disarm him, saying that she was not afraid of him if he did not have a pistol. I refused to do that unless she let me call Mr. Montgomery, the nearest neighbor. She then went to the window, and said Mr. Harrison was sleeping, and that, if I would just wait a minute, she would go in herself and slip the pistol from him. She opened one of the windows of the front of the house on the gallery and returned in a few minutes and handed me a pistol, saying that, if I would take the pistol, she would no longer be afraid of Mr. Harrison, as he was then sleeping, and that when he awakened she knew that he would be sober and she would no longer be in danger. That’s about the synopsis of what occurred.”
The witness adds that he has never known the defendant to be drunk since that day.
The 13 year old son testifies that about two years before the institution of the suit his father had his mother against a door through which she had tried to get out, and that he had struck her or that “his arm seemed to threaten to strike her. I came up and told papa he had better look of the way, and get out of the way, and quit fooling with mamma. ' He took me by the arm and thrust me out of the front door of the dining room. That is all I know of that occurrence.”
The same witness remembers his mother’s leaving the matrimonial home three or four times. Does not know why. As to the last of these occurrences he testifies as follows:
“Q. Did you see your mamma going down from the hotel that night?
“A. Yes, sir.
“Q. Willie there?
“A. Yes, sir.
“Q. Was Willie crying that night?
“A. Yes, sir.
*423 “Q. Was Willie crying going down from the hotel that night?
“A. Yes, sir.
“Q. Why was he crying?
“A. He was crying because papa had mamma by the arm, and mamma was saying that he hurt her, and Willie was pulling and hitting at'papa to try to make him let her loose.
“Q. Did you see Willie pulling at your father?
“A. Yes, sir.
“Q. You say that your papa had hold of your mamma’s arm leading her down the street?
“A. Pulling her, not leading her.
“Q. Did you hear your mamma say that he was hurting her?
“A. Yes, sir.
“Q. Was your mamma pretty scared?
“A. Yes, sir.”
In connection with the same occurrence Dr. A. P. Barrow testifies as follows:
“Q. Doctor, you recall the time ’of some excitement on the corner at the time Mr. Harrison is said to have brutalized his wife?
“A. Yes, sir.
“Q. Mr. Kilbourne has sworn that you and Mr. Golsan went to Mr. Harrison’s house that night. Did you go?
“A. Yes, sir; I did.
“Q. State what occurred, doctor? What took place down there? What happened?
“A. You and myself; I called you out of the council meeting. Mr. Harrison suggested that we go and see for ourselves what the trouble was. lie denied having brutalized Mrs. Harrison ; so Judge Golsan and myself went down to where Mrs. Harrison is now living, and Mrs. Harrison came out. I forget which one acted as spokesman, but I think I was the one who stated that the report on the corner was that Mr. Harrison had brutalized her and choked her, and that we were calling as a committee to find out the truth of the matter. Her explanation was that Mr. Harrison had not choked her, nor brutalized her, but had taken her by the arm and told her to stop her foolishness and come home. She supposed from that the impression had gotten out something-like that. That led the people to believe that he choked her and brutalized her. She seemed very much distressed about the publicity of the thing. She was worried and excited, and seemed to regret her part in it. She went on to say that she screamed when passing my house, with the thought that 'I would come out. But I did not hear her. That’s about all that occurred at Mrs. Harrison’s house, I believe, that I remember.
“Q. Did you offer Mrs. Harrison safe conduct back to the hotel?
“A. My impression is that she said she was sorry for all this occurrence, and hoped that nothing -would happen to Mr. Harrison for it. Mr. Harrison might have taken her arm a little roughly in the excitement. That’s about all I can recollect in the interview.
“Q. Do you recollect whether Mrs. Harrison sent Mr. Harrison any message?
“A. I do not recall it. She may have done so.
“Q. Did you assure her that Mr. Harrison would not be permitted to hurt her?
“A. I did.”
A lady testifies that the day after this occurrence the arm of plaintiff was bruised.
It must have been immediately preceding the occurrence just related that the following happened:
“Q. Do you remember anything, Blair, about one night, several weeks 'ago, when your father came into your room and you went into your mother’s room?
“A. Yes sir.
“Q. What happened that night? Do you know?
“A. No, sir; I was sleeping, and he came and woke me up, and told me to get out of my bed and go into my mother’s bed. I went in, and mamma told me that papa had been striking her.”
The same witness testifies in another connection as follows:
“Q. Did you ever hear your father scold your mamma for going- out without his permission?
“A. I have heard him several times ask her if she had been out, and she said, ‘No.’ But one time, when the hat was lying on the bed and the umbrella was there, he said that he wanted to know where she had been, and she said, ‘Nowhere.’ He asked her how it happened that the umbrella and hat were lying on the bed, and she said that she was trying to sell it. And then I moved away, but afterwards I asked mamma, and she said the umbrella was thrown under the bed. I did not know where the hat was.
“Q. Was the umbrella not found on the front gallery?
“A. I think it was there on the front gallery, or where the hat was.
“Q. Did not your father pick up the umbrella?
“A. Don’t remember exactly.
“Q. Did you not find the hat on the bed?
“A. Yes, sir; the hat was on the bed.
“Q. Did you pick up the hat?
“A. Papa picked up the hat and threw it back on the bed.
“Q. State what your mamma said.
“A. I was not present for the rest of it.
“Q. You were there when the row commenced ?
“A. Yes, sir; when I would hear them fussing, I would move out on the front gallery, or somewhere else.
“Q. Blair, would your mamma fuss at your papa?
“A. I did hear her say something about him doing the baby act. I did not know what she was referring to.
*424 “Q. Would your mamma quarrel at your papa?
“A.' No, sir; I did hear her say once at the table about him doing the baby act.
“Q. Now, Blair, you say that when they began to quarrel you moved away?
“A. I don’t know, sir, which one did the last quarreling. I went away. I was not present at any of them.
“Q. Who would be doing the quarreling when you would go away? ■
“A. Well, either one or the other. I would not pay much attention to it, so I don’t remember exactly.
“Q.- Well, would not your mamma quarrel as much as your papa?
“A. No. sir.”
Concerning plaintiff, Dr. A. S'. Barrow testifies as follows:
“Q. Doctor, do you know Mrs. Harrison’s temperament?
“A. I expect I am pretty well acquainted with it.
“Q. What sort of temperament did she have?
“A. I think she is very nervous. Since I have known her she has been laboring under a good many distresses. I don’t know what her temperament was before that.
“Q. Is she hysterical?
“A. I have never seen her in an attack of hysteria. I have seen her in a great state of nervous excitement bordering on an attack of hysteria.
“Q. Doctor, did you ever tell Mr. Harrison, or speak to him, or state to him, about the mental condition of Mrs. Harrison?
“A. I think I advised Mr. Harrison, just after the death of her little daughter, he had better throw some controlling influence around his wife, because, if her nervous strain was not relieved, it might result in serious condition.
“Q. Did you ever tell him about Mrs. Harrison being daft on the subject of Mr. Harrison?
“A. I have never, that I know of, told Mr. Harrison that Mrs. Harrison was crazy. I told him that she was most intensely sane on every subject as far as I could judge, unless it be about him. That was the idea I meant- to convey. I would not consider her an insane person from what I could judge. I meant to convey that impression when I told Mr. Harrison that I did not think she was insane, unless she might be a little off on questions relating to him. I knew that she disliked him.”
In substantiation of the charge of public defamation, plaintiff produced four witnesses to whom defendant had stated in conversation that she was insane; and she showed that defendant, without cause, or even any excusé whatever, had published in the local newspaper the following:
“To Whom It may Concern: I hereby notify the public that I will not be responsible for any debts contracted by my wife, Bessie Knox Harrison.
“R. A. Harrison.”
There is a statement in the evidence to the effect that defendant had sent word he would not defend the suit; but he has done so, and vigorously. He shows that he furnished a comfortable home for his wife, subscribing to newspapers and magazines for her benefit. The next-door neighbor testifies that she had never seen any disturbance between the parties, and had often seen Mr. Harrison helping in the household work. Defendant offered to prove by their colored servants, who had been employed in the house from 1892 to 1904, 13 in number, that during their respective service he had been uniformly kind and gentle in his conduct towards his wife. He showed: “That at Christmas preceding the suit he had made her the following presents: A desk, a pocket satchel, a pair of opera glasses, silver nail file, gold thimble, -gold waist pins, and a check; and shortly afterwards gold stick pins, a chafing dish, a cut glass silver-top powder box, and a cut glass silver-top cold cream box; and later a three glass folding mirror; and at other times made her other presents. That within the last year she had made one trip to New Orleans and one trip across the lake, looking for a house. That in June she had gone to New Iberia to visit relatives. That in 1903 she had spent over a month in Selma, Ala., and had visited the St. Louis fair. Defendant produces plaintiff’s letters to him during 1902, 1903, and 1904. They are not effusive, yet they indicate that the parties were on good terms, and certainly that he was solicitous of her well-being, and disposed to contribute thereto to the full extent of his means.
The spreading of the report that plaintiff was insane and the publishing of the .notice warning the public against extending credit *425 to her are not in themselves sufficient to support an action from bed. and board on the ground of defamation; but, possessed as she presumably is of the delicacy of feeling usually engendered by culture and refinement, plaintiff must have suffered keenly from being thus disparaged and aspersed, and it may well have contributed its good part in bringing about the accumulated sense of wrong that finally drove her permanently from hep home.
Learned counsel say that the act of defendant did not amount to the spreading of a report; that he is not shown to have thus spoken to more than four persons; and that these were friends of long standing, and it was in reality the sorrowful unbosoming one’s self of a distressing thought weighing upon one’s mind in the confidence of friendly intercourse. The answer to that is that, while only four are produced, there is no telling to how many more defendapt may have spoken; that these are not shown to have been friends, but ouly acquaintances; and that if to these, why not to many others of the townspeople, all of whom know each other, and even to outsiders. If defendant had really doubted the perfect sanity of his wife, proper consideration for her feelings should have prompted him to guard jealously the painful secret, and not to blab it.
Excesses and cruel treatment can justify a separation only when “of such a nature as to render the living together insupportable.” Civ. Code, art. 138. The evidence in this case is not strong. All the same it shows that defendant has been violent to plaintiff on more than one occasion, and it 'goes far towards showing, if it does not actually show, that he has struck her. The court must be mindful that during these several years of married life plaintiff may well have shrunk from the humiliation of the public exposure of the unhappiness of her married life, and may, besides, have been disposed rather to shield her husband from public censure than to deliver him up to it. She evinced in a marked maimer such a disposition on the night when the rough manner in which he had led her along the street had excited the public indignation. To the gentlemen who had intervened for her protection she belittled what had occurred, while she besought her husband not to expose himself to the risk of going to his office that night. The admission is that plaintiff is a woman of the highest culture and refinement. The higher we rise in the social scale, and the more jealously guarded, we find, is the secret of the unhappiness of families, or of the troubles between spouses. In how many cases the outside world, and even servants and children, can know nothing of the real situation. They only catch glimpses here and there of what is going on in the married life; and on the imperfect information thus derived must the courts proceed when eventually appealed to. The mouth of the plaintiff is sealed, and therefore all the more significance must be attached to the few facts that crop out here and there. The very great probability is that she would not have repeatedly abandoned the matrimonial domicile if her life therein had not been insupportable.
The judgment of the lower court was in favor of plaintiff. We have concluded to affirm it. It is only for separation from bed and board. The parties will have one year for reflection before the marriage ties can be dissolved by final decree.
Judgment affirmed.